UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **KELLER NORTH AMERICA, INC.,** | ) | **CASE NO. 1:20CV2401** |
| | ) | |
| **Plaintiff,** | ) | **SENIOR JUDGE** |
| | ) | **CHRISTOPHER A. BOYKO** |
| **vs.** | ) | |
| | ) | |
| **JEREMY EARL, et al.,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

**CHRISTOPHER A. BOYKO, SR. J.:**

Before the Court is Defendants Josh Senk and Michels Corporation's Motion to Dismiss (Doc. 22) Plaintiff Keller North America, Inc.'s Amended Complaint.  Keller opposes dismissal at this stage of the proceeding.  (Doc. 26).  For the following reasons, the Court **GRANTS, IN PART,** and **DENIES, IN PART,** Defendants' Motion to Dismiss and **DISMISSES** Defendant Senk from the lawsuit.

## I. BACKGROUND FACTS[1]

Keller and Michels compete in the geotechnical engineering market, a highly competitive and technical market.  In developing its competitive position, Keller has invested a significant amount of time and resources into developing certain procedures and tools, what Keller calls "trade secrets."

---

[1] At this stage, the Court construes the Amended Complaint in Keller's favor, accepts all allegations as true and draws all reasonable inferences in Keller's favor.  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Defendant Jeremy Earl worked for Keller for seven years.  When he resigned in August of 2020, he served as the Cleveland, Ohio area manager.  In this position, Earl managed 72 individuals and had full profit and loss responsibility for Cleveland operations.  He also had access to Keller's trade secrets.

During the Summer of 2020, Earl and Keller's relationship soured.  For example, Keller alleges that Earl failed to pursue a business opportunity worth $10 million to Keller.  Disagreement ensued and Earl resigned.  The next day, on July 18, 2020, Earl emailed his Keller-work account a reminder "to copy email addresses of customers and mobile numbers." (Doc. 17-2, PageID: 313).  He also copied various information from his work computer to personal devices.  After taking these actions however, Earl apparently changed his mind.  He rescinded his resignation and continued in his role at Keller.

From July 23, 2020 until his resignation on August 28, 2020, Earl remained Keller's employee.  But, with this lawsuit, Keller alleges something more nefarious occurred during this month.  Instead of dedicating his time and energies towards Keller's success, Keller believes Earl's continued employment was just a ruse between Earl and Michels to advance Michels' position in the Cleveland-area market.

Following the recission of his resignation, Earl and Michels allegedly entered discussions concerning Earl's new employment at Michels.  And during these negotiations, Earl continued to access Keller's trade secrets and copy those same secrets to his own personal devices.  He also neglected to further Keller's position respecting certain business opportunities.  According to Keller, Michels received at least one of those business opportunities.

Earl also targeted his coworkers at Keller, offering them the opportunity to join him at Michels.  He, along with Defendant Donald Williams, conducted meetings on Keller property

with other workers, outlining their plains to leave Keller to work for Michels.  During one of these meetings, Earl called Defendant Josh Senk, a manager at Michels.  Senk apparently told all in attendance to leave Keller and follow Earl and Williams to Michels.

Michels ultimately offered Earl employment.  In this new role at Michels, Earl would be serving in a substantially similar role as he did for Keller.  Earl accepted Michels' offer on August 24, 2020.  But he did not immediately resign from Keller.  Instead, Earl continued to meet with Keller employees and accessed confidential information, including emails pertaining to two business opportunities.

On August 28, 2020 – four days after he accepted employment with Michels – Earl resigned from Keller.  Before his resignation, Keller was unaware of Earl's subterfuge.  Not until Earl and three others resigned in a coordinated manner did Keller become suspicious.

After investigation, Keller filed its original Complaint against Earl, Williams, Senk and Michels on October 22, 2020.  Once he received service of this Complaint, Earl allegedly destroyed the personal electronic devices on which he maintained Keller information.  According to Keller, this information would have been helpful to its case against Defendants.

Defendants Senk and Michels moved to dismiss the original Complaint.  After further briefing, Keller requested leave to amend its Complaint, which the Court granted.  This Amended Complaint therefore mooted Defendants' original Motion to Dismiss.

On January 13, 2021, Keller filed its Amended Complaint, bringing one count against Senk and eight counts against Michels.  Both Defendants again moved to dismiss all counts against them.  (Doc. 22).  Keller opposed the motion (Doc. 26) and Michels and Senk filed a Reply shortly thereafter (Doc. 28).

## II. LAW & ANALYSIS

### A.     Standard of Review – Rule 12(b)(6)

In reviewing a motion to dismiss, courts construe the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draw all reasonable inferences in favor of the plaintiff.  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  Factual allegations contained in a complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  *Twombly* does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  A court should dismiss if the complaint lacks an allegation as to a necessary element of the claim raised.  *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 491 (6th Cir. 1990).

The United States Supreme Court, in *Ashcroft v. Iqbal*, discussed *Twombly* and provided additional analysis of the motion to dismiss standard:

> In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pled factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. 662, 679 (2009).

According to the Sixth Circuit, the standard described in *Twombly* and *Iqbal* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."  *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). The Court should disregard conclusory allegations, including legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555; *J & J Sports Prods. v. Kennedy*, 2011 U.S. Dist.

LEXIS 154644, *4 (N.D. Ohio Nov. 3, 2011).  A written instrument attached to a pleading is part of the pleadings for all purposes.  Fed. R. Civ. Pro. 10(c).

Finally, "Rule 12(b)(6) does not countenance…dismissals based on a judge's disbelief of a complaint's factual allegations…a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable…" *Twombly*, 550 U.S. at 556.

Michels and Senk's Motion to Dismiss can be broken down into three general attacks on the Amended Complaint.  First, they attack Keller's claim that Earl acted as an agent for Michels.  Second, Keller's common law claims against Michels must fail because Ohio statutory law preempts the claims.  And finally, Michels and Senk attack the merits of whatever claims remain after their first two arguments.  Understanding these general arguments, the Court addresses each below.

## B.     Agency

Undergirding Defendants' Motion to Dismiss is the attack on Keller's agency theory. According to Defendants, Keller insufficiently pled facts to establish either an agency relationship existed or that Earl acted within the relationship's confines.  Keller disagrees.  In rebuttal, Keller points to specific allegations to support its theory.  Defendants acknowledge these allegations but argue that they go to Earl's actions as opposed to Michels.  Therefore, it is not plausible that Earl acted as Michels' agent.

"In Ohio, the doctrine of respondeat superior can hold an employer or principal vicariously liable for the tort of its employee or agent in certain circumstances." *Sitton v. Massage Odyssey, LLC*, 158 N.E.3d 156, 159 (Ohio Ct. App. 2020) (citing *Auer v. Paliath*, 17 N.E. 561, 564 (Ohio 2014)).  For liability to attach to the principal-employer, a plaintiff must demonstrate "[1] that a principal-agent relationship exists (e.g., employer and employee) and [2]

that the perpetrator committed a tortious act within the scope of employment." *Id.* When the tort is intentional, "the behavior giving rise to the tort must be calculated to facilitate or promote the business for which the servant was employed." *Byrd v. Faber*, 565 N.E.2d 584, 587 (Ohio 1991) (citations omitted). "A party who claims that a principal is responsible for the acts of an employee is obligated to prove the agency and scope of the employee's authority." *Aetna Cas. v. Leahey*, 219 F.3d 519, 542 (6th Cir. 2000).

However, the existence and extent of the agency relationship is typically a question of fact. *McWilliams v. S.E. Inc.*, 581 F. Supp. 2d 885, 893 (N.D. Ohio 2008). At the pleading stage then, the plaintiff must allege the agency relationship with sufficient specificity to make the relationship apparent from the face of the pleading. *Toms v. Delta*, 124 N.E.2d 123, 126-27 (Ohio 1955). Mere legal conclusions of agency are insufficient. *Bird v. Delacruz*, 2005 WL 1625303, at *4 (S.D. Ohio July 6, 2005).

With the above in mind, it helps to review caselaw that found agency was insufficiently pled. Take, for example, Defendants' cite of *McWilliams*. There, plaintiff did not provide any allegations of agency in its complaint. *McWilliams*, 581 F. Supp. 2d at 893. Rather, the plaintiff first raised the potential agency relationship when he opposed defendant's motion to dismiss. *Id.* Applying the above pleading principles to the case, the court easily determined plaintiff did not adequately plead the agency claims. *Id.*

Whatever short falls that may exist with Keller's Amended Complaint, it certainly contains more allegations pertaining to a relationship between Earl and Michels then existed in *McWilliams*. Read as a whole, the Amended Complaint alleges that some sort of relationship existed between Earl and Michels, which led to employment. And, after interpreting the factual allegations in Keller's favor, Earl undertook actions that could have 'facilitated or promoted'

Michels' business.  For example, Keller alleges Earl withheld certain business opportunities from Keller.  Michels then allegedly received those business opportunities.  So it is plausible at this stage that Earl acted on Michels behalf to procure those business opportunities to Keller's detriment.

Again, Keller clearly pleaded the existence of a relationship between Earl and Michels. The extent of that relationship remains unknown.  Is it an employee merely preparing for new employment?  Or is it something more nefarious as Keller alleges?  Discovery will tell.  Thus, to the extent Defendants rely on arguments to dismiss Keller's Amended Complaint, the Court disagrees.

**C.     Ohio's Uniform Trade Secret Act ("OUTSA") – Preemption**

Next, Defendants attack the Amended Complaint's common-law claims because Ohio's Uniform Trade Secret Act ("OUTSA") preempts them.  Again, Keller disagrees, arguing that each claim survives.  For the following reasons, the Court agrees with Defendants in part and with Plaintiff in part.

*i.     General Preemption Rules under OUTSA*

Generally, Ohio Revised Code Section 1333.67 displaces "conflicting tort, restitutionary and other laws of [Ohio] providing civil remedies for misappropriation of a trade secret."  OHIO REV. CODE § 1333.67(A).  However, "other remedies not based on a misappropriation of a trade secret…are not affected."  *Id.*  at § 1333.67(B).

The Sixth Circuit has laid out the following standard for courts to follow when confronted with a preemption challenge:

> The test to determine whether a state law claim is displaced by OUTSA is to determine whether the claims are no more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for trade secret misappropriation.  Where

> the state-law claim has a factual basis independent from the facts
> establishing the OUTSA claim, the portion of the claim supported
> by an independent factual basis survives preemption.

*Stolle Mach. Co., LLC v. Ram Precision Indus.*, 605 Fed. App'x 473, 485 (6th Cir. Mar. 16,

2015) (internal citations omitted).

Keller argues preemption is inappropriate at this stage and that the Court should save the

analysis for after discovery.  While some caselaw supports Keller's position, *see Exal Corp. v.

Roeslein & Assocs., Inc.*, 2012 U.S. Dist. LEXIS 143917, at *7-9 (N.D. Ohio Oct. 2, 2012);

*Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 3d 972, 990 (N.D. Ohio 2008), there exists equal

support to allow courts to dismiss common law claims before discovery if they are drawn

entirely from the trade secret allegations, *see Cincom Sys., Inc. v. LabWare, Inc.*, 2021 WL

675437, at *5 (S.D. Ohio Feb. 22, 2021) (collecting cases); *Office Depot, Inc. v. Impact Office

Prods., LLC*, 821 F. Supp. 2d 912, 920-21 (N.D. Ohio 2011) (partially preempting common law

claims at the motion to dismiss stage).  The Court agrees with the courts in *Cincom* and *Office

Depot* and will address Keller's common-law claims against these preemption principles.

*ii.    Keller's Misappropriation Claim*

But before analyzing each claim, the Court must review what Keller alleges in its

misappropriation claim.  While not neatly presented in one paragraph, the Amended Complaint

presents the following 'trade secrets':

- Design and engineering information (i.e., manufacturing, installation and geotechnical problem-solving techniques, engineering plans, technical submissions, calculations);

- Customer related information (i.e., confidential prospective and current customer lists; customer specifications; client problem-solving techniques); and

- Confidential business-practice information (i.e., pricing, competitive practices, bidding information, business opportunities information, proposals, estimates, financial information).

(Doc. 17, ¶¶ 18, 19, 29, 44, & 50).  Whether this information constitutes trade secrets under

OUTSA "need not be addressed prior to making a determination of displacement." *Thermodyn*,

593 F. Supp. 2d at 989-90.  Thus, even if the "information does not rise to the level of a trade

secret," the claim may be preempted.  *Miami Valley Mobile Health Servs. v. ExamOne*

*Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012).

 Keller then alleges Earl misappropriated these trade secrets when "he transferred Keller's

trade secrets to his personal email accounts and/or external hard drives in the days and weeks

leading to his departure from Keller when Earl knew he would be joining Michels as well as

after he became an agent for Michels while still employed by Keller."  (Doc. 17, ¶ 133).  Keller

also claims that it is inevitable that Earl will disclose trade secret information to Michels by

virtue of his new position with Michels.  (*Id.* at ¶ 131).

 *iii.* *Interference with Prospective Business Relationship (Count III)*

 OUTSA preempts Keller's claim for Interference with Prospective Business Relationship

against Defendants Earl and Michels.  Reviewing Keller's Amended Complaint, Keller alleges

Earl interfered with Keller's prospective business relationship by "accessing Keller's

confidential information and forwarding it to himself[.]"  (Doc. 17, ¶ 109).  Because of this,

Michels "improperly gained access to Keller's confidential information and used that…to

damage Keller's business relationships with prospective customers."  (*Id.* at ¶ 110).  These

actions fall squarely within Keller's misappropriation-of-trade-secrets claim.  (*See id.* at ¶ 133).

 Keller's opposing argument does not prevent preemption.  In its Opposition, Keller

argues "the claim[] for interference with prospective business relationships…[is] different"

because, while both claims involve customers, "the interference claim does not necessarily

involve Earl's and Michels' misappropriation of trade secrets."  (Doc. 26, PageID 439-40).  But

beyond this general rebuttal, Keller does not advance *how* the claims differ or what the interference claim involves beyond the misappropriation of trade secrets.

One of Michels substantive defenses to the interference claim underscores the appropriateness of preemption. Michels claims that, as a competitor, it is justified to compete for business with Keller. Whether Michels is justified to compete in this manner hinges on whether it used wrongful means. And those wrongful means here are based on Earl's alleged misappropriation of trade secrets. *See Stolle*, 605 Fed. App'x at 485 (affirming preemption of interference with business relationship claim because the claim restated the operative facts of the misappropriation of trade secret claim under OUTSA).

Finally, in defending its OUTSA claim, Keller argues that its business opportunities constitute trade secrets. (Doc. 26, PageID: 446). Keller alleged the same in its Amended Complaint. (Doc. 17, ¶ 28). Whether these business opportunities ultimately constitute trade secrets is irrelevant for preemption purposes. But the Court does find relevant that Keller wishes to leave the trade secret realm for preemption purposes yet hold Michels accountable for misappropriating these same opportunities for its OUTSA claim. Again, this highlights that the same operative facts are the core of both claims.

Therefore, OUTSA preempts Keller's Interference with Prospective Business Relationships and the Court **DISMISSES** Count III against Michels.

> iv.    *Conspiracy (Count IV)*

OUTSA preempts in part Keller's claim for Conspiracy against all Defendants because certain allegations involve the misappropriation of trade secrets. Keller alleges the following in its conspiracy claim:

- Defendants "conspired with each other…to deprive Keller of its *expected business relationships with prospective customers*."

- Earl and Michels conspired with each other "to transfer *Keller's confidential and trade secret information* from Earl's Keller email account to Michels, as well as from other electronic devices Earl used to copy Keller's confidential and trade secret information."

- Defendants further conspired with each other "to improperly solicit Keller employees to leave employment with Keller in favor of Michels and bring with *them their knowledge of Keller's confidential information and trade secrets*."

(Doc. 17, ¶¶ 115, 117, & 121) (emphasis added).  These allegations clearly involve the same operative facts as Keller's OUTSA claim.  And Keller does not seriously contest the issue.  To that extent, OUTSA preempts these allegations.

But, as Keller highlights, the conspiracy claim involves additional allegations.  Specifically, Keller alleges Defendants conspired to have Earl "work as a double agent for both Keller and Michels and use his status as a double agent to coerce other Keller employees to resign from Keller and follow him to Michels."  (*Id.* at ¶ 118).  The Court agrees with Keller — this allegation is outside of the OUTSA-claim's operative facts.

Therefore, Keller's conspiracy claim survives preemption in part and will be subjected to Defendants' attack on the merits below.

### v.    Tortious Interference with a Contract (Count VIII)

OUTSA preempts Keller's claim for Tortious Interference with a Contract against Michels.  At the outset, the Court finds that Earl had a contract with Keller setting forth certain obligations, contrary to Michels' argument that no contract existed.  However, the obligations contained in the contract are in line with Michels' position.

When he accepted an offer for promotion in March 2018, Earl promised to do the following:

- To disclose only to Keller all ideas, methods, plans, developments or improvements known by Earl which relate directly or indirectly to the

- 11 -

business of Keller, whether acquired by Earl before or during employment with Keller;

- To keep in strict secrecy and confidence any and all information Earl assimilated or to which he had access to during his employment with Keller and which had not been publicly disclosed and is not common knowledge in Keller's fields of work; and

- To not disclose any such confidential information to any third person, partnership, joint venture, company or other organization, both during and after Earl's employment term with Keller, without Keller's prior written consent.

(Doc. 17-1, PageID: 310).[2]

Keller argues these obligations "prohibit Earl from using his status as a secret Michels employee to recruit Keller employees to leave the company and join Earl at Michels." (Doc. 26, PageID: 449). The Court disagrees with Keller's interpretation. Nothing in the contract prohibits Earl from soliciting coworkers to join him should he depart Keller's employ. Rather, the contract concerns Earl's obligations surrounding confidential information and what he may (or may not) do with that information.

Moving from Earl's obligations, the Court holds that the claims underlying both Keller's misappropriation claim and the interference with contract claim concern 'the same operative facts.' To successfully state a claim for tortious interference with a contract, Keller must allege: (1) the existence of a contract; (2) Michels' knowledge of the contract; (3) Michels' intentional procurement *of the contract's breach*; (4) the lack of justification; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (emphasis added); *see also White v. Adena Health Sys.*, 2018 WL 3377087, at *13 (S.D. Ohio July 11, 2018) (applying *Fred Siegel* at motion to dismiss stage).

---

[2] To the extent this exhibit (Doc. 17-1) contradicts Keller's allegations in the Amended Complaint, "the exhibit trumps the allegations." *Cares v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017).

Central then to Keller's interference claim is *whether Earl breached the contract*.  Given his obligations outlined above, Earl would breach the contract by disclosing trade secrets without Keller's consent, the same operative facts alleged in Keller's misappropriation claim.  While Keller would have this Court focus on Michels' actions, the crux of the claim involves Earl's breach of confidentiality obligations by misappropriating trade secrets.

Since the same operative facts are involved in both claims, Keller's Tortious Interference with a Contract claim is preempted and therefore **DISMISSED**.  *See Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 722-23 (N.D. Ohio 2009) (preempting claim for tortious interference with contract under OUTSA); *Campfield v. Safelite Group, Inc.*, 2021 WL 1215869, at *14 (S.D. Ohio Mar. 31, 2021) (preempting claim for tortious interference with a contract under OUTSA even though proof of claim would require proving additional elements, the core of the claim is the same operative facts of OUTSA claim).

    *vi.*      *Fraud (Count X)*

OUTSA preempts in part Keller's claim for Fraud against Michels because certain allegations involve the misappropriation of trade secrets.  Based on the Court's review, Keller's fraud claim stems mainly from Earl and Michels coercion of Keller-employees to leave Keller. These allegations have nothing to do with Keller's OUTSA claim and thus survive preemption.

But Keller does allege that it "did not consent to Michels secretly accessing Keller's confidential information and trade secrets at its place of business by way of Earl." (Doc. 17, ¶ 169).  Thus, to the extent Keller bases its fraud claim on misappropriation facts, the claim is preempted.

But the allegations involving employee solicitation survive and will be subjected to Michels' attack on the merits below.

- 13 -

**D.**     **Count IV – Conspiracy Claim**

Based on the above preemption analysis, Keller's remaining conspiracy claim involves the alleged inappropriate behavior of all Defendants to improperly solicit Keller's employees. Michels and Senk say this claim fails on its merits for two reasons: one, Keller did not plead the claim with the requisite specificity; and two, Michels and Senks' underlying acts are lawful. Based on the Court's reading of Keller's Opposition, Keller addresses the first argument but not the second.  And this omission is fatal to its claim.

To state a claim for civil conspiracy under Ohio law, plaintiffs must allege (1) a malicious combination; (2) of two or more persons; (3) that injured plaintiff or its property; and (4) the existence of an unlawful act independent from the actual conspiracy.  *Mangelluzzi v. Morley*, 40 N.E.2d 588, 601 (Oh. Ct. App. 2015).  Like most claims, vague and conclusory allegations unsupported by material facts are insufficient to state a claim for civil conspiracy. *Dotson v. Wilkinson*, 477 F. Supp. 2d 838, 852 (N.D. Ohio 2007).  Moreover, "[a] civil conspiracy claim cannot succeed without an underlying unlawful act."  *Roark v. Rydell*, 881 N.E.2d 333, 340 (Oh. Ct. App. 2007) (citing *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)).  That unlawful act must be actionable in the absence of the conspiracy.  *Kelley v. Buckley*, 950 N.E.2d 997, 1016 (Oh. Ct. App. 2011); *see also Matikas v. Univ. of Dayton*, 788 N.E.2d 1108, 1116 (Oh. Ct. App. 2003) (parties cannot conspire to do that which they are legally entitled to do).

Keller's claim for conspiracy against Michels and Senk fails because Keller has not identified an unlawful act Michels and Senk committed.  As Michels and Senk contend, they can compete against Keller by recruiting employees.  Keller does not address this argument and therefore waives the issue.  *See Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D.

Ohio 2005); *Fijalkowski v. Belmont Cty Bd. of Comm'rs*, 2021 WL 1964478 (S.D. Ohio May 17, 2021).  And it does not become the Court's responsibility to search the Amended Complaint and craft a rebuttal to Defendant's position.

The Court agrees with Defendants Michels and Senk.  They certainly can compete with Keller, which may entail poaching employees.  The issue is whether Michels and Senk crossed the line.  And Keller did not plausibly demonstrate how these Defendants crossed that line.  Therefore, the Court **DISMISSES** Keller's claim for Conspiracy against Michels and Senk.

**E.      Counts V & VI – OUTSA & Federal Misappropriation of Trade Secrets Claim[3]**

Keller has stated a claim for misappropriation of trade secrets under OUTSA.  Michels attack on this claim stems largely from the claim of agency.  Moreover, Michels argues that certain information cannot constitute a trade secret and that there are no allegations that Michels misappropriated any secret.  Keller disputes these contentions, arguing that Michels has benefitted from Earl's actions and will continue to benefit from Earl's inevitable disclosure.  Therefore, Keller believes discovery will prove to what extent Michels misused the trade secrets.

To succeed on a claim for misappropriation of trade secrets, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) that was acquired as a result of a confidential relationship; and (3) the unauthorized use of the trade secret.  *Allied Erecting & Dismantling Co., Inc.*, 649 F. Supp. at 711.  Ohio law defines a 'trade secret' as certain information that derives independent economic value from not being generally known and is the subject of reasonable efforts to maintain its secrecy.  *See* OHIO REV. CODE § 1333.61(D).  Whether a particular knowledge or process constitutes a trade secret is a question of

---

[3] The requirements for establishing misappropriation of trade secrets are largely the same under both Ohio and federal law.  *Aday v. Westfield*, 2020 WL 5517243, at *4 (S.D. Ohio Sept. 14, 2020).  Therefore, the Court analyzes both claims together in Section E.

fact to be determined by the trier of fact upon the greater weight of the evidence.  *See Thermodyn Corp.*, 593 F. Supp. 2d at 986; *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986).  Ohio courts have found that pricing and bid quoting information may constitute trade secrets.  *Poseidon Envtl. Servs. v. Nu Way Indus. Waste Mgmt., LLC*, 102 N.E.3d 1145, 1155-56 (Oh. Ct. App. 2017).

As for unauthorized use, Ohio law "permits a plaintiff to recover damages when a defendant has misappropriated the plaintiff's trade secrets, either by acquiring the trade secrets through improper means, or…using the trade secrets without the express or implied consent of the owner of the trade secrets."  *Matco Tools Corp. v. Urquhart*, 435 F. Supp. 3d 802, 812 (N.D. Ohio 2020) (citing Ohio Rev. Code § 1333.61(B)); *see also Fred Siegel Co., LPA*, 707 N.E.2d at 861.

With the above in mind, Michels arguments fail.  As to the existence of trade secrets, Michels acknowledges that the information taken on July 18, 2020 may constitute trade secrets. But it does not believe the "business opportunities emails" can be classified as trade secrets. This belief is mistaken.  Not only does Keller allege that the business opportunities constitute trade secrets, (*see* Doc. 17, ¶ 28), but Ohio law seems to agree.  *See Poseidon*, 102 N.E.3d at 1155-56; *Thermodyn*, 593 F. Supp. 3d at 986 ("customer lists and pricing information can constitute trade secrets"); *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000) (information relating to an employer's customer lists, pricing information, sales strategies and business philosophy amount to 'trade secrets' under Ohio law).  These opportunities originally came to Keller emails, not Earl's personal email.  The Court may reasonably infer that the emails reflect potential customers, pricing strategies and overall business strategy.  Moreover, the Court cannot accept Michels' "presumption" (*see* Doc. 28,

PageID: 474) that the same opportunities went to all bidders.  At this stage, Keller alleged

enough facts for the Court to reasonably infer that such business opportunities could qualify as

trade secrets under OUTSA.

Moreover, the Amended Complaint contains facts that make it plausible Michels'

misappropriated Keller's trade secrets.  Michels incorrectly focuses on "who" committed and

"when" the initial wrongful act of taking the trade secrets occurred.  Because Earl took the initial

action before his relationship started with Michels, Michels believes it cannot be held liable.  But

again, this belief is mistaken.  As mentioned, Ohio law punishes more than the initial download

or misuse of the trade secret.  Rather, offenders may be liable if they knew the information was

acquired by improper means and yet they used that information or used that information without

the owner's consent.  *See* OHIO REV. CODE § 1333.61(B).

Keller alleges sufficient facts to support the inference that Michels misused information it

received from Earl.  The clearest example is that Keller alleges Michels received at least one of

the business opportunities Earl forwarded to himself.  While Michels may not have initially

misused the email directed to Earl, it is plausible that Michels later used the information to

procure the business opportunity for itself.

Accordingly, Keller stated a claim for misappropriation of trade secrets against Michels.

Therefore, the Court **DENIES** Michels Motion to Dismiss these Counts.

F.    **Count VII – Computer Fraud & Abuse Act Claim**

Michels next argues that it cannot be held liable under the Computer Fraud and Abuse

Act, § 1030 et seq. ("CFAA"), because Keller authorized Earl to access the information at issue.

Keller counters by arguing that this is not about Earl *exceeding* his authorization, but rather

accessing the system *withou*t authorization in the first place.  Keller justifies this approach by

claiming Earl lost authorization contemporaneously when Earl accepted employment with Michels.

The Court agrees with Michels.  The CFAA generally "prohibits accessing data one is not authorized to access."  *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 760 (6th Cir. 2020).  To state a claim for relief under the CFAA, a plaintiff must plead that Defendant: (1) intentionally accessed the computer; (2) without authorization or exceeded the authorized access; (3) obtained information from a protected computer by that access; and (4) caused at least $5,000 loss to one or more persons during any one-year period.  *Id.* at 759.  "[A] violation for accessing 'without authorization' under the CFAA occurs only where initial access is not permitted[.]" *Ajuba Intern., L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 687 (E.D. Mich. 2012).

Here, Keller does not dispute that it authorized Earl to access its information systems. Further, beyond the conclusion that Earl lost authorization once his relationship began with Michels, Keller does not allege it affirmatively revoked Earl's authorization.  And no allegations exist that anyone else from Michels accessed Keller's computer systems.

Keller cites no caselaw for its theory that Earl immediately lost authorization to access its systems once he accepted employment with Michels.  Rather, the proper question seems to be whether Earl exceeded his authorization in using Keller's systems.  But the Supreme Court has recently announced that a person does not exceed authorized access to a system even if that person obtains the information from the system for an improper purpose.  *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021).

That situation seems to fit here — Earl accessed Keller's systems with his authorization, but then improperly used information therein to benefit himself and Michels.  *Van Buren* tells us that the CFAA does not punish that behavior.  And since Earl cannot be held responsible for

violating the CFAA, neither can Keller hold Michels vicariously liable for Earl's behavior. *See Taddeo v. Bodanza*, 2014 WL 4244340, at ¶ 18 (Oh. Ct. App. Aug. 28, 2014) (citing *Natl. Union Fire Ins. Co. v. Wuerth*, 913 N.E.2d 939, 944 (Ohio 2009) (a principle is vicariously liable for the act of its agent only when the agent is directly liable for the subject act)).

Accordingly, since Keller has not stated a claim for relief under the CFAA, the Court **DISMISSES** Count VII against Michels.

## G.      Count IX – Tortious Destruction of Evidence Claim

Next, Michels argues it cannot be held liable for Earl's destruction of evidence because 1) Keller did not allege Michels knew Earl possessed or that Michels directed Earl to destroy the information; and 2) Earl did not act within the scope of his employment when he destroyed the evidence. Keller argues that discovery will confirm Earl's scope of employment. Moreover, Keller claims its allegations present the possibility that Earl destroyed evidence to protect Michels from liability.

The Court agrees with Keller. Ohio recognizes a "cause of action in tort for the interference with or destruction of evidence." *Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993). In order to state a claim for relief under this theory, a plaintiff must demonstrate: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of defendant that litigation exists or is probable; (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts. *Id.*; *see also Thermodyn Corp.*, 593 F. Supp. 2d at 978.

Unlike Michels' general argument above, Michels acknowledges it employed Earl at the time Earl destroyed the evidence. Rather, the issue is one of scope. And Ohio law tells us that

"the expression of 'scope of employment' cannot be accurately defined because it is a question of fact to be determined according to the peculiar facts of each case." *Kestranek v. Crosby*, 2010 WL 1099923 (Oh. Ct. App. Mar. 25, 2010) (quoting *Rogers v. Allis-Chalmers Mfg. Co.*, 153 N.E.2d 677, 683-84 (Ohio 1950)).  "[T]he determination of whether conduct is within the scope of employment...turns on...whether the employee acted or believed himself to have acted, at least in part, in his employer's interests." *Auer*, 17 N.E.2d at 566.  Thus, while Michels correctly asserts it cannot be liable for Earl's self-serving acts, it can be liable if Earl's acts facilitated its business. *Groob v. KeyBank*, 843 N.E.2d 1170, 1178 (2006).

Here, Keller alleges sufficient facts to establish an employment relationship between Earl and Michels at the time Earl destroyed the evidence.  Indeed, Michels admits as much. Furthermore, the allegations raise a plausible factual scenario that Earl acted in furtherance of Michels interests when Earl destroyed the evidence he allegedly misappropriated.  By destroying this evidence, Keller's case against both Earl and Michels became more complicated.  Any tie between information Earl took and Michels allegedly used has been erased, which certainly facilitates Michels position in this litigation.  And Michels' lack of knowledge of the information is irrelevant.  Michels knew of this litigation and therefore knew Earl potentially took confidential information when he left Keller.

Because the Amended Complaint alleges sufficient facts that Earl acted within the scope of his employment when he destroyed the misappropriated evidence, Keller has stated a claim for relief against Michels.  Michels' request to dismiss this Count is therefore **DENIED**.

## H.    Count X – Fraud Claim

Finally, Michels argues that it cannot be held liable under a theory of fraud because Keller did not state its claim with particularity and Michels does not have a duty to disclose to

Keller the truth about Earl.  Keller opposes by citing allegations and by again focusing on Earl's actions.  Keller claims that Earl had a duty to disclose to Keller his relationship and, as Michels' agent, that duty also extended to Michels.

The Court agrees with Michels.  Claims sounding in fraud, including fraudulent omission claims, must meet Rule 9(b)'s heightened pleading standard.  *Szep v. General Motors LLC*, 491 F. Supp. 3d 280, 293 (N.D. Ohio 2020).  Thus, plaintiffs must identify "the who, when, where and how" of the allegedly fraudulent conduct.  *William Beaumont Hosp. Sys. v. Morgan Stanley & Co., LLC*, 677 Fed. App'x 979, 983 (6th Cir. Jan. 26, 2017).  "Vague allegations of generic misrepresentations or omissions are not sufficient to survive a Rule 12(b)(6) challenge." *Id.*

In order to state a claim for fraud then, a plaintiff must demonstrate the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance.  *Walker v. Firelands Cmty. Hosp.*, 869 N.E.2d 66, 76 (Oh. Ct. App. 2007) (citing *Burr v. Stark Cty. Bd. of Commrs.*, 491 N.E.2d 1101, 1105 (Ohio 1986)).  Thus, actionable fraud "may consist not only of an affirmative misrepresentation, but also of nondisclosure when there is a duty to disclose." *Levy v. Seiber*, 57 N.E.3d 331, 338 (Oh. Ct. App. 2016).  In the absence of a duty to disclose a concealed fact to the plaintiff, concealment of the fact does not constitute fraud. *Szep*, 491 F. Supp. 3d at 296.  And, as with other elements of a fraud claim, a plaintiff must plead with particularity that the defendant owed plaintiff a duty to disclose.  *Randleman v. Fidelty Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 822 (N.D. Ohio 2006).

- 21 -

Keller has not alleged with particularity the duty Michels owed to Keller.  According to Keller, Michels concealed Earl's true loyalties from Keller.  But Keller does not say how or why Michels had a duty to disclose the truth of its relationship with Earl.  Again, Michels may compete with Keller.  Keller acknowledges as much, saying Michels could properly recruit its employees if Michels "fully disclosed" its intentions.  (Doc. 26, PageID: 451).  Keller cites no caselaw to support this "full disclosure" requirement.  The Court did not locate any similar cases proceeding under a similar theory.  And even if this "duty of full disclosure" could support a fraud claim, the Court finds that Keller did not plead sufficient facts to support this duty in its Amended Complaint.

Therefore, the Court agrees with Michels and **DISMISSES** Count X against Michels.

### III. CONCLUSION

For the reasons above, the Court **GRANTS, IN PART** and **DENIES, IN PART** Defendant's Motion to Dismiss.  Specifically, the Court:

- **DISMISSES** Count III, Interference with Prospective Business Relationship against Michels because OUTSA preempts the claim.

- **DISMISSES** Count IV, Conspiracy against Defendants Michels and Senk because Keller failed to state a claim upon which relief may be granted.  The Court **DISMISSES** Defendant Senk from the lawsuit;

- **DENIES** Michels' Motion to Dismiss Counts V & VI, Misappropriation of Trade Secrets under OUTSA and the Defend Trade Secrets Act;

- **DISMISSES** Count VII, violation of the Computer Fraud and Abuse Act because Keller failed to state a claim upon which relief may be granted;

- **DISMISSES** Count VIII, Interference with Contract against Michels because OUTSA preempts the claim;

- **DENIES** Michels' Motion to Dismiss Count IX, Destruction of Evidence; and

- **DISMISSES** Count X, Fraud against Michels because Keller failed to state a claim upon which relief may be granted.

**IT IS SO ORDERED.**

 s/ Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**Senior United States District Judge**

**Dated: August 24, 2021**